ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY *v.* SMITH.

Opinion delivered July 8, 1929.

*King, Mahaffey & Wheeler,* for appellant.

*John E. Harris* and *Sizer & Gardner,* for appellee.

McHANEY, J. This suit was instituted under the Federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) by the administratrix of the estate of Sterling Smith, deceased, to recover damages for the benefit of his widow and children and his estate, on account of his injuries and death while in the employ of appellant railway company as brakeman, alleged to have been caused by its negligence. There was a verdict and judgment for appellee, and the case is here on appeal.

We find it necessary to discuss only one question, in view of the disposition we make of it, and that is the sufficiency of the evidence to support the verdict, which was challenged by a request for a directed verdict, and is the principal ground urged here for a reversal.

Since this suit was brought and prosecuted under the Federal Employers' Liability Act, which does not define negligence, the question as to the sufficiency of the evidence to establish negligence must be determined by that act and the applicable principles of the common law as construed by the Federal courts. *Mo. Pac. R. Co.* v. *Skipper,* 174 Ark. 1083, 298 S. W. 849. As said by the Supreme Court of the United States in *Atlantic Coast Line R. Co.* v. *Davis,* 239 U. S. 34, 49 S. Ct. 210, 73 Law ed. 230: "It is unquestioned that the case is controlled by the Federal Employers' Liability Act, under which it was prosecuted. Hence if it appears from the record that, under the applicable principles of law as interpreted by the Federal courts, the evidence was not sufficient in kind or amount to warrant a finding that the negligence of the railroad company was the cause of the death, the judgment must be reversed." Citing *Gulf M. & N. R. Co.* v. *Wells,* 275 U. S. 455, 457, 72 L. ed. 370, 371, 48 Sup. Ct. Rep. 151, and cases cited.

We find the rule governing the State courts well stated in the case of *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Coogan,* 271 U. S. 472, 46 Sup. Ct. Rep. 564, as follows:

"By the Federal Employers' Liability Act Congress took possession of the field of employers' liability to employees in interstate transportation by rail, and all State laws upon that subject were superseded. Second Employers' Liability Cases (*Mondon* v. *New York, N. H. & H. R. Co.*), 223 U. S. 1, 55, 56 L. ed. 327, 348, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 167, 1 N. C. C. A. 875; *Seaboard Air Line R. Co.* v. *Horton,* 233 U. S. 492, 501, 58 L. ed. 1062, 1068, L. R. A. 1915C 1, 34 Sup. Ct. Rep. 635; Ann. Cas. 1915B, 475, 8 N. C. C. A. 834. The rights and obligations of the petitioner depend upon that act and applicable principles of common law as interpreted by the Federal courts. The employer is liable for injury or death resulting in whole or in part from the negligence specified in the act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several states. This court will examine the record, and, if it is found that, as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed. *St. Louis I. M. & S. Ry. Co.* v. *Mc-Whirter,* 229 U. S. 265, 277, 57 L. ed. 1179, 1186, 33 Sup. Ct. Rep. 858; *New Orleans & N. E. R. Co.* v. *Harris,* 247 U. S. 367, 371, 62 L. ed. 1167, 1170, 38 Sup. Ct. Rep. 535; *New Orleans & N. E. R. Co.* v. *Scarlet,* 249 U. S. 528, 63 L. ed. 752, 39 Sup. Ct. Rep. 368."

The act referred to provides that carriers by railroad shall be liable in damages to their employees for "injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Our statute, § 8562, C. & M. Digest, making railroads in this State responsible for all damages to persons and property done or caused by the running of

trains in this State, has, so far as this case is concerned, been superseded, as also the rule of this court, announced in many decisions, that, where an injury is caused by the operation of a train, a *prima facie* case of negligence is established against the company.

Bearing in mind that the death of the deceased, Smith, must have resulted "in whole or in part from the negligence of" one or more of the employees of appellant working with him at the time, and that "proof of such negligence is essential to recovery," let us scrutinize the evidence in the light most favorable to appellee, which is a rule of the Federal courts (Coogan case, *supra*) as well as our own, to determine whether the testimony, together with all inferences the jury might reasonably draw therefrom, be sufficient, as a matter of law, to support the verdict and judgment. The facts, briefly stated, are as follows:

Appellee's intestate was a young man, 36 years of age, a railroad brakeman for appellant, having three years' experience, a wife and four minor children. On July 9, 1927, the date of his tragic death, he was head brakeman on a freight train running from Hugo, Oklahoma, to Ashdown, Arkansas. The crew consisted of an engineer, fireman, conductor and two other brakemen, Rhodes, swing brakeman, and Wallace, rear brakeman. The train arrived at Ashdown, in Arkansas, sometime between 2 and 3 A. M., the night being very dark, and was headed into the passing track in front of the station, the caboose having been cut off and left standing on the main track. The conductor, on arrival, had got off the train and gone to the interlocking plant, the tower, for instructions. The other operatives cut the three head cars off the train, brought them back on the main line, coupled them to the caboose, and continued backing the three cars and caboose, same being a coal-car, a box-car, a tank car and the caboose, past the tower, where the conductor again got on the rear end of the caboose. The object of the movement then was to set the three cars

between the engine and caboose on the Spencer Switch, which makes out from the main line to the south thereof and west of the main line of the Kansas City Southern Railway, the latter running from northwest to southeast, and the Frisco running east and west, the crossing being near the tower. A gravel public road running parallel with the Kansas City Southern crosses the Frisco, about 100 feet west of the crossing tracks, and there is a connecting track between the two railroads, running south from the Frisco and connecting on the south side of the Kansas City Southern. The switch stand for this connecting track is about 100 feet west of the west line of the highway and on the south side of appellant's track. It is about 6 or 8 feet from the switch point of the connecting switch to the switch point of the Spencer Switch, the switch stand for the Spencer Switch being on the north side of the main line of appellant. These figures of distances are given by Conductor Caldwell, a witness for appellee. According to them, the stand for manipulating the Spencer Switch is located about 268 feet west of the crossing of the tracks of the two railroads, assuming that the highway does not exceed 60 feet in width. A statement of these facts is deemed important in view of what follows. After the conductor had boarded this cut of cars, he found the three brakemen on the rear end of the caboose, and advised them. the purpose of the movement, as above stated, and that it should be accomplished by uncoupling the caboose from the three cars, "kicking" it west of the Spencer Switch on the main line so as to put it in the clear, throw the Spencer Switch, and place the three cars thereon. All three brakemen understood the movement and how it was to be accomplished. Smith, the deceased, being the head or front brakeman, assumed, as was proper, the duty of uncoupling the caboose from the tank car which was next to it, crossing over to the north side of the tracks and throwing the switch after the caboose had passed, so as to shunt the other three cars on the

Spencer Switch. Rhodes, the swing brakeman, assumed, as was proper, the duty of attending the derail on the Spencer Switch, which had to be opened to permit the cars to pass up this track when the engine pushed them back. It was the duty of Wallace, the rear brakeman, to stay on the caboose and set the brakes so as to stop it in the clear on the main line after the "kick." A signal was given the engineer to make the "kick," which is accomplished by applying more steam so as to increase the speed of the train in order that the momentum thereby imparted to the caboose would carry it to the desired point after being uncoupled. To uncouple the caboose it was necessary for Smith to go to the front end, descend to the bottom step on the south side and raise or lift the lever, a safety device for pulling the coupling pin. It is certain that Smith did this, as the caboose was uncoupled, and rolled to the place desired of its own momentum. After doing this, as above stated, it was his duty to go to the switch stand on the north side of the track and throw the Spencer Switch. He was never seen alive by any person after starting for the front end of the caboose. Rhodes got off to attend the derail after the caboose passed, missed Smith, because he could not see the light of his lantern, signaled the engineer to stop, which he did, and, after investigation, found his dead and mangled body under the center of the middle car, both trucks of the tank car and the west trucks of the box-car having passed over his body. His head was north of the north main line track and his feet to the south between the tracks. His lantern was between the tracks, with the light extinguished. No witness was able to say just how the accident happened.

This case was tried by appellee on the theory that it was Smith's business to give the "kick" signal to the engineer; that it was in fact given by Rhodes without Smith's knowledge; and that the engineer responded to such signal, made the "kick" unexpectedly to Smith, which threw him between the cars, and caused his death. This is the principal ground of negligence relied on.

Although the evidence is in dispute as to whose business it was to give such signal, we will assume that it was Smith's. It is not disputed that there were three appliances at the front end of the caboose to hold to, a guard rail extending across the entire end of the platform and down both sides, about waist high, a ladder at hand running to the top of the caboose, and a grab-iron on the south side of this end. It will be assumed that deceased occupied the proper place, the lowest step on the south side, to raise the lever to pull the coupling pin. This would put him in a slightly stooping position to reach the lever, and some two or three feet south of the south rail. Appellee says that, when the engineer responded to the unexpected "kick" signal, the sudden lurch caused him to fall, that he caught on the guard rail at the rear end, and was swung around so as to fall across the north rail and be thus run over and killed. While there is no direct testimony that this is what happened, we are asked to approve it as an inference reasonably to be deduced by the jury from the evidence. It is said that the "kick" given the caboose was sufficient to send it up the track, slightly up-grade, some 325 feet, which indicates the severity or force of the kick. But we cannot agree that this was sufficient to establish that the death of Smith resulted in whole or in part from the negligence of Rhodes in giving the signal, assuming it to be negligently or wrongfully done. He knew that a "kick" signal was to be given. He knew the object of the movement and how it was to be done. He actually pulled the pin before the kick was made, else there would have been a sudden jerk caused by an increased pressure of steam in the cylinders and suddenly cutting off all steam. If the pin had been in place, a jerk would have followed, and all the witnesses agree there was no jerk. The deceased was not a tall man, only 5 feet 8 inches in height. It is difficult to see just how he could be caused to fall by an increased speed of the caboose, which was never more than 10 or 12 miles per hour, and swing from the bottom

step, some two or three feet south of the south track, so as to fall with his head and part of his chest across the north track. But there is no evidence that he fell off the caboose at all. We must indulge a presumption or surmise to reach this conclusion. Is it an inference reasonably to be deduced from the evidence? We think not. There was no sudden, unexpected, unusual jerking of the caboose, but only a gradual increase in speed, not to exceed 10 or 12 miles per hour from the rate it was traveling. It appears to us that it is just as probable that he got off the caboose to cross over the north side and throw the switch; that, in doing so, he either stumbled and fell in the dark across the track, or was struck by the car following and was knocked down on the track. One seems about as probable as the other. It may have happened either way, or some other and different way. As said by Judge Woolley, speaking for the Court of Appeals in *Reading Co.* v. *Boyer,* 6 Fed. 2d Series, 185:

"There was no evidence which tended to prove how the accident happened. As we have stated, it might have occurred in one of several ways. The only way conceivably involving negligence of the defendant was the lack of ballast between the main track and the track of the siding. We do not concede that lack of ballast in such a place constituted negligence, yet, assuming that it did, there is no evidence which remotely indicates that the decedent 'lost his footing and was thrown under the train' because of lack of ballast. As there were other ways in which Boyer might have met his death which did not involve negligence of the defendant, the case falls, we think, within the rule of *Murray* v. *Pittsburgh, etc. R. Co.,* 263 Pa. 398, 403, 107 A. 21, 23, followed by this court in *Philadelphia & Reading Ry. Co.* v. *Cannon,* 296 F. 302, wherein the Supreme Court of Pennsylvania said: 'It is not enough for plaintiff to show his injury might have been due to more than one possible cause, for only one of which defendant is responsible. He is obliged to go further and show the cause that fastens liability upon

defendant was the proximate one, and the jury should not be permitted to base a verdict upon a mere conjecture that the injury was caused by one or the other.' This is but another statement of the old rule that a party seeking to recover damages for injuries occasioned by negligence must establish negligence by affirmative testimony. Of course this does not mean that negligence must always be proved by the testimony of eye-witnesses. *Philadelphia & Reading Ry. Co.* v. *Effinger* (C. C. A.), 299 F. 950, but it does mean that it must be established, if not by the testimony of eye-witnesses, then by surrounding facts and circumstances which, though inanimate, speak the truth and affirmatively prove the fact. We cannot find in the record any testimony which tends to prove how Boyer met his death, and accordingly we have not found any evidence to support the verdict of the jury, that his death was occasioned by negligence of the defendant.''

This is also the rule in this court. Juries are not permitted to base verdicts on mere conjecture or speculation. There must be substantial testimony of essential facts, or facts which would justify a reasonable inference of such essential facts, on which to base a verdict, before it will be permitted to stand. *St. Louis, I. M. & S. Ry. Co.* v. *Smith,* 117 Ark. 655, 174 S. W. 547; *St. Louis, I. M. & S. Ry. Co.* v. *Belcher,* 117 Ark. 638, 175 S. W. 418; *Texas Co.* v. *Jones,* 174 Ark. 905, 298 S. W. 343.

The burden was upon appellee, not only to establish negligence, but that such negligence was the proximate cause of the injury. Assuming therefore that the act of brakeman Rhodes in giving the ''kick'' signal constituted negligence, there is a total lack of proof or inferences reasonably to be drawn therefrom that such negligence was the proximate cause of the injury, or that such injury resulted in whole or in part from such negligence. We have therefore reached the conclusion that the verdict and judgment are without substantial evidence to sup-

port them, and must be reversed, and the cause remanded for a new trial.

HUMPHREYS and KIRBY, JJ., dissent.